PEOPLE v HILL

Docket No. 301564. Submitted September 11, 2012, at Detroit. Decided
   February 5, 2013, at 9:05 a.m.

   Eric Conrad Hill was charged in the 43rd District Court with the
   manufacture of less than 5 kilograms or fewer than 20 plants of
   marijuana, after the police discovered marijuana plants growing
   under a light in a bedroom closet in defendant's home. The police
   entered defendant's home without a warrant to perform a welfare
   check after a discussion with one of his neighbors who had
   contacted the police because she was concerned that defendant
   might need assistance. The district court, Keith P. Hunt, J.,
   granted defendant's motion to dismiss, concluding that the war-
   rantless search of defendant's home was unconstitutional and that
   the community-caretaking exception to the warrant requirement
   did not apply. The prosecution appealed and the Oakland Circuit
   Court, Leo Bowman, J., agreed and affirmed the district court's
   dismissal of the charge. The Court of Appeals denied the prosecu-
   tion's application for leave to appeal and the Supreme Court
   remanded the case to the Court of Appeals for consideration as on
   leave granted. 491 Mich 870 (2012).

      The Court of Appeals held:

      1. A warrantless search is constitutional when the police
   conduct the search as part of their community-caretaking function
   and the police actions are totally unrelated to their duties associ-
   ated with investigating crimes. Rendering aid to persons in dis-
   tress is a community-caretaking function. The police must be
   primarily motivated by the perceived need to render assistance or
   aid and may do no more than is reasonably necessary to determine
   whether an individual is in need of aid and assistance. An entering
   officer must possess specific and articulable facts that lead him or
   her to the conclusion that a person inside a home is in immediate
   need of aid. The officer's reasons must be reviewed, as well as the
   level of the intrusion; entry into a person's home is more intrusive
   than into his or her automobile because privacy of the home is at
   the core or the Fourth Amendment's protections. A reviewing
   court must consider the specifics of the entry; proof of the need for
   aid must be reasonable, but not ironclad. In this case, the circuit

court erred by affirming the district court's dismissal of the manufacturing of marijuana charge against defendant. The police officers' warrantless entry into defendant's home was constitutionally valid on the basis of the community-caretaking exception to the warrant requirement. The officers entered the house to perform a welfare check, they were not investigating a crime, and under the circumstances of this case it was reasonable to conclude that defendant may have been in need of assistance. Direct evidence definitively showing that defendant was present in the house and in actual need of assistance is not necessary for the community-caretaking exception to apply. The lack of definitive signs that defendant was present and in distress or danger did not negate the possibility that defendant was present and need of aid.

2. Evidence found as the result of a warrantless, unconstitutional entry is not subject to exclusion if the police were operating in good faith when the entry was made. The purpose of the exclusionary rule is to deter future Fourth Amendment violations. The deterrent value of exclusion is strong when the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights; the exclusionary rule is not applied in the absence of governmental misconduct. In this case, even if the community-caretaking exception does not apply, exclusion of the evidence was not necessary because the police had some evidence of need and acted in good faith when they entered defendant's home to check on his welfare; exclusion of the evidence would not deter police misconduct in the future.

Reversed and remanded for reinstatement of the marijuana manufacturing charge.

MARKEY, J., dissenting, would have affirmed the circuit court's order that affirmed the district court's order excluding the marijuana plants and dismissing the charge against defendant. She would have concluded that the warrantless search and seizure could not be justified by the emergency-aid exception to the warrant requirement because there were no credible, specific, and articulable facts that anyone was inside defendant's home that might need immediate aid. Judge MARKEY would also have concluded that the community-caretaking exception did not apply because there was no evidence to support a reasonable belief that there was an imminent threat to life or property. In addition, there was no evidence to support a finding that the police acted in good faith when they entered defendant's home without a warrant.

SEARCHES AND SEIZURES — WARRANTLESS SEARCHES — COMMUNITY-CARETAKING
EXCEPTION — POLICE OFFICERS — REASONABLENESS OF ENTRY.

 A warrantless search is constitutional when the police conduct the
search as part of their community-caretaking function and the
police actions are totally unrelated to their duties associated with
investigating crimes; the police must be primarily motivated by
the perceived need to render assistance or aid and may do no more
than is reasonably necessary to determine whether an individual is
in need of aid and assistance; an entering officer must possess
specific and articulable facts that lead him or her to the conclusion
that a person inside a home is in immediate need of aid; direct
evidence definitively showing that a person is present in his or her
home and in actual need of assistance is not necessary for the
community-caretaking exception to apply.

*Bill Schuette*, Attorney General, *John J. Bursch*,
Solicitor General, *Jessica R. Cooper*, Prosecuting Attorney, and *Thomas R. Grden*, Appellate Division Chief, for
the people.

*The Law Offices of Terri L. Antisdale* (by *Terri L.
Antisdale*) for defendant.

Before: MURPHY, C.J., and MARKEY and WHITBECK, JJ.

MURPHY, C.J. Defendant was charged with the manufacture of less than 5 kilograms or fewer than 20 plants
of marijuana, MCL 333.7401(2)(d)(*iii*), after the police
discovered marijuana plants under a grow light in a
bedroom closet in defendant's home. The police entered
defendant's house without a warrant on the basis of a
discussion with one of defendant's neighbors who was
worried about his well-being, along with other circumstantial evidence that suggested defendant was in need
of assistance. The district court granted defendant's
motion to suppress the evidence and it dismissed the
charge, concluding that the warrantless search of defendant's home was unconstitutional and that the
community-caretaking exception to the warrant re-

quirement was not implicated under the facts presented. The circuit court affirmed the district court's ruling on the prosecution's appeal. This Court denied the prosecution's application for leave to appeal, but our Supreme Court, in lieu of granting leave, remanded the case to this Court "for consideration as on leave granted." *People v Hill*, 491 Mich 870; 809 NW2d 563 (2012). We hold that the warrantless entry into defendant's home by police did not violate the protections against unreasonable searches and seizures set forth in article 1, § 11, of the Michigan Constitution and the Fourth Amendment of the United States Constitution; given all the surrounding circumstances, the community-caretaking exception to the warrant requirement was implicated. Moreover, even were we to assume that a constitutional violation occurred, this is not a case in which the exclusionary rule should apply as there is no evidence of police misconduct. Accordingly, we reverse and remand for reinstatement of the marijuana manufacturing charge.

We review for clear error findings of fact made by a trial court at a hearing on a motion to suppress evidence predicated on allegations that the police violated a defendant's constitutional rights. *People v Slaughter*, 489 Mich 302, 310; 803 NW2d 171 (2011). However, matters regarding the application of facts to constitutional principles, such as the right to be free from unreasonable searches and seizures, are reviewed de novo. *Id.*

Entry into a person's home by the police absent a warrant may be constitutionally valid under certain limited circumstances. *Id.* at 311. Although many warrantless searches are properly deemed unconstitutional pursuant to the warrant requirement, the United States Supreme Court has articulated several excep-

tions wherein a warrantless search is reasonable and thus constitutional, including a search by police conducted as part of their community caretaking function. *Id.* at 311-312.[1] For the community-caretaking exception to apply, the actions of the police must be totally unrelated to the duties of the police to investigate crimes. *Id.* at 314, quoting *People v Davis*, 442 Mich 1, 22; 497 NW2d 910 (1993). Rendering aid to persons in distress is a community-caretaking function. *Id.* at 23 ("entries made to render aid to a person in a private dwelling [are] part of the community caretaking function").

The police must be primarily motivated by the perceived need to render assistance or aid and may not do more than is reasonably necessary to determine whether an individual is in need of aid and to provide that assistance. *Slaughter*, 489 Mich at 315 n 28. An entering officer is required to possess specific and articulable facts that lead him or her to the conclusion that a person inside a home is in immediate need of aid. *Id.* "Proof of someone's needing assistance need not be 'ironclad,' only 'reasonable.'" *Id.* (citation omitted). The *Slaughter* Court further observed:

> [C]ourts must consider the reasons that officers are undertaking their community caretaking functions, as well as the level of intrusion the police make while performing these functions, when determining whether a particular intrusion to perform a community caretaking function is reasonable. For instance, a police inventory of a car is much less intrusive than a police entry into a dwelling. This is because the privacy of the home stands at the very core of the Fourth Amendment and because in no setting is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's

---

[1] The Michigan Constitution is generally construed to provide the same protection as the Fourth Amendment. *Slaughter*, 489 Mich at 311.

home. Thus, the threshold of reasonableness is at its apex
when police enter a dwelling pursuant to their community
caretaking functions. [*Id.* at 316 (citations, quotation
marks, ellipses, and alterations omitted).]

Police officer Mike Emmi testified in this case that he
and another officer went to defendant's home shortly
after midnight on March 8, 2010, as part of a welfare
check after defendant's neighbor had called police with
concerns about defendant's well-being. According to
Emmi, when the officers arrived, the neighbor ap-
proached them and indicated that in the last few days to
a week she had not seen or heard from defendant and
that, for the same time period, defendant's vehicle had
not moved from his property, even though defendant
would typically come and go in the vehicle on a regular
basis. The neighbor also informed the officers that she
could generally hear defendant working in his house
during the night, but she had not heard him working for
several nights. The neighbor mentioned that the inte-
rior lights in defendant's house had been on for a while
and that she had seen defendant's cats looking out the
home's windows. The neighbor was worried about de-
fendant and explained to Emmi that all these circum-
stances were unusual. Officer Emmi noticed that an
interior house light was turned on, that there were six
to eight pieces of mail in the mailbox, which were a few
days old at most, that a phonebook was sitting on the
front porch, and that defendant's car, which was cold
and covered with some leaves, was sitting in the drive-
way. Emmi testified that he and the other officer
knocked on defendant's door several times, but there
was no answer. The officers also contacted dispatch and
asked the dispatcher to make a phone call to defen-
dant's home.

Emmi indicated that the officers proceeded to knock
on back windows and yell out, asking if anyone was

present, but there was no response. Emmi testified that he could hear "a humming noise" through one of the windows that sounded "like a humidifier or a heater." The officers were able to slide open an unlocked window and, according to Emmi, they "yelled inside several times in an attempt to locate anybody, but still did not receive an answer." Emmi indicated that most of the drapes were drawn and that he could not, for the most part, see inside the home by looking through the windows. Emmi stated that a decision was made to enter the house and search for defendant for purposes of a welfare check. The officers then contacted dispatch again and informed the dispatcher that they were going to enter the house to do a welfare check. The officers entered the house and eventually they opened a bedroom closet and found the marijuana plants. Emmi testified that the closet was "tall enough for a person." The officers discovered that the source of the humming noise was a heater near the marijuana plants; there is no indication or suggestion in the record that the officers entered the house because they suspected that the humming noise was coming from a heater typically used in marijuana growing operations. Emmi testified that defendant had a prior conviction, but Emmi was not aware of the conviction when he entered the house. Emmi claimed that he did not enter the home to investigate criminal activity. According to Emmi, there were no visible signs of a home invasion, no unusual odors emanating from the home, no signs of violence, and no sounds of someone in distress.[2]

---

[2] We respectfully disagree with the dissent's interpretation of some of the testimony given by Emmi. The dissent states that the neighbor "admittedly had little to no interaction with defendant, who lived several houses away." *Post* at 416. Emmi testified that it was his belief that the neighbor lived "next-door one house west or two houses west" of defendant's residence, not "several" houses away. Emmi further testified

On application of the legal principles cited above and enunciated in *Slaughter*, we conclude that the community-caretaker exception to the warrant requirement was implicated after consideration of all the surrounding circumstances taken together. The lower courts mistakenly relied on a lack of direct evidence definitively showing that defendant was present and in actual need of aid or assistance. Although there were no signs of forced entry or sounds of someone in distress, the circumstances were such that an officer could reasonably conclude that defendant might be in need of aid or assistance. The neighbor informed the officers that defendant would leave his house and return on a normal basis using his vehicle to travel, and defendant's car, covered with some leaves, had been sitting in the driveway unused for several days and was parked there when the police arrived. This would reasonably suggest that defendant was in his house when police came upon the scene, which conclusion finds additional support in the evidence showing that it was after midnight and the

that the neighbor knew defendant on "a first name basis" and that she knew him "as a friend as a neighbor." Emmi's testimony in general revealed that the neighbor was quite familiar with defendant's comings and goings, including the fact that he worked inside his house at night. There was no testimony indicating that the neighbor admitted to having little or no interaction with defendant. The dissent maintains that the neighbor was "of unknown credibility," *post* at 416, but while Emmi did not describe the nature of the contacts, he did testify that he "had a few contacts" with the neighbor in the past, and given Emmi's reliance on her concerns, it is reasonable to infer that the past contacts did not involve unreliable claims. The dissent also contends that Emmi entered defendant's home solely for the purpose of seeing "if . . . someone were inside." *Post* at 416. Emmi, however, testified multiple times that the purpose of entry was to do a welfare check. Finally, the dissent complains that Emmi failed to speak with other neighbors living next to or across the street from defendant. However, when asked about whether he contacted these other neighbors, Emmi testified that "there was no one there" as to the houses on the east and west sides and that neighbors from across the street approached him but only after the entry.

lights were on in defendant's house, which was common at night according to the neighbor because of defendant's proclivity to work in his house at night. These facts indicated that defendant was present in the house, there were extensive efforts by the police to obtain a response from anyone inside the home that failed, including knocking on the door and yelling through a window, and the neighbor had not heard any work activity that night by defendant, which was uncommon. Given the reasonable conclusion that defendant might have been in the home (the lights were on and the car was parked outside), and considering the lack of response to the police officers' aggressive efforts to communicate, it was reasonable to conclude that defendant was not only present but in need of attention, aid, or some kind of assistance. This becomes even more apparent when one considers the presence of the phonebook on the porch and the few days of mail that had accumulated in the mailbox. Moreover, the neighbor had informed the officers that she was worried about defendant and that the situation at defendant's home was unusual. When all the pieces of information are considered together and not individually, the sum of their parts equates to specific and articulable facts that would lead an officer to reasonably conclude that defendant was in need of aid. And the steps taken by the responding officers, who were motivated by the perceived need to render assistance, were no more than reasonably necessary to determine whether defendant was truly in need of aid. The lack of definitive signs that defendant was present and in distress or danger did not negate the possibility that defendant was present and in need of aid, and the surrounding circumstances suggested that such was the case.

Imagine that the police officers had decided against entering defendant's house and that defendant was

inside unconscious or otherwise unable to communicate and in critical need of medical attention as a result of a criminal act or physiological event. In such a scenario, if defendant had later died due to a lack of timely aid, the community uproar over the officers' failure to enter the home would be deafening, and public criticism regarding the lack of police action would be, in our view, reasonable and deserved in light of the surrounding circumstances.[3]

This leads us to a separate discussion relative to the application of the exclusionary rule. We find that, even if a constitutional violation by the officers had occurred on the basis of a lack of criteria sufficient to justify invocation of the community-caretaker exception, there is no need to invoke the exclusionary rule because the good-faith exception to the rule has gradually been extended by the courts to situations outside its traditional or historical contexts, and the police officers in this case were clearly acting in good faith.

---

[3] The dissent takes us to task for not citing an appellate case that has virtually identical circumstances and in which the community caretaking exception was applied. However, as noted by our Supreme Court in *Slaughter*, 489 Mich at 319, community-caretaking functions are varied and are undertaken for different reasons; therefore, "reviewing courts must tailor their analysis to the specifics of a particular intrusion before determining whether it is reasonable." *Id*. Given the nature of these types of cases, it is highly unlikely that another appellate opinion has addressed nearly identical facts, such that a sound comparison could be made. Rather, we have proceeded as directed by *Slaughter* and tailored our analysis to the specific and unique facts regarding the particular entry at issue, resulting in our conclusion that the warrantless entry was reasonable. We agree with the general sentiments expressed in the lead opinion in *People v Ray*, 21 Cal 4th 464, 472; 88 Cal Rptr 2d 1; 981 P2d 928 (1999), that, in connection with the community-caretaking exception, "[l]ocal police 'should and do regularly respond to requests of friends and relatives and others for assistance when people are concerned about the health, safety or welfare of their friend, loved ones and others.' " (Citation omitted.)

In *Davis v United States*, 564 US ___; 131 S Ct 2419, 2426-2429; 180 L Ed 2d 285 (2011), the United States Supreme Court discussed the Fourth Amendment, the exclusionary rule, the good-faith exception to the rule, and the evolution of the good-faith exception to the exclusionary rule:

> The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Amendment says nothing about suppressing evidence obtained in violation of this command. That rule—the exclusionary rule—is a "prudential" doctrine, created by this Court to "compel respect for the constitutional guaranty." Exclusion is "not a personal constitutional right," nor is it designed to "redress the injury" occasioned by an unconstitutional search. The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations. Our cases have thus limited the rule's operation to situations in which this purpose is "thought most efficaciously served." Where suppression fails to yield "appreciable deterrence," exclusion is "clearly . . . unwarranted."
>
> Real deterrent value is a "necessary condition for exclusion," but it is not "a sufficient" one. The analysis must also account for the "substantial social costs" generated by the rule. Exclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a "last resort." For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.
>
> Admittedly, there was a time when our exclusionary-rule cases were not nearly so discriminating in their approach to the doctrine. "Expansive dicta" in several decisions, suggested that the rule was a self-executing mandate implicit in the Fourth Amendment itself. As late

as ... 1971 ... the Court "treated identification of a
Fourth Amendment violation as synonymous with applica-
tion of the exclusionary rule." In time, however, we came to
acknowledge the exclusionary rule for what it undoubtedly
is—a "judicially created remedy" of this Court's own mak-
ing. We abandoned the old, "reflexive" application of the
doctrine, and imposed a more rigorous weighing of its costs
and deterrence benefits. In a line of cases beginning with
*United States v Leon,* 468 US 897; 104 S Ct 3405; 82 L Ed
2d 677 [(1984)], we also recalibrated our cost-benefit analy-
sis in exclusion cases to focus the inquiry on the "flagrancy
of the police misconduct" at issue.

The basic insight of the *Leon* line of cases is that the
deterrence benefits of exclusion "var[y] with the culpability
of the law enforcement conduct" at issue. When the police
exhibit "deliberate," "reckless," or "grossly negligent" dis-
regard for Fourth Amendment rights, the deterrent value
of exclusion is strong and tends to outweigh the resulting
costs. But when the police act with an objectively "reason-
able good-faith belief" that their conduct is lawful, or when
their conduct involves only simple, "isolated" negligence,
the " 'deterrence rationale loses much of its force,' " and
exclusion cannot "pay its way."

The Court has over time applied this "good-faith" ex-
ception across a range of cases. *Leon* itself, for example,
held that the exclusionary rule does not apply when the
police conduct a search in "objectively reasonable reliance"
on a warrant later held invalid. ...

Other good-faith cases have sounded a similar theme.
*Illinois v Krull,* 480 US 340; 107 S Ct 1160; 94 L Ed 2d 364
(1987), extended the good-faith exception to searches con-
ducted in reasonable reliance on subsequently invalidated
statutes. In *Arizona v Evans,* [514 US 1; 115 S Ct 1185; 131
L Ed 2d 34 (1995)], the Court applied the good-faith
exception in a case where the police reasonably relied on
erroneous information concerning an arrest warrant in a
database maintained by judicial employees. Most recently,
in *Herring v United States,* 555 US 135; 129 S Ct 695; 172
L Ed 2d 496 [(2009)], we extended *Evans* in a case where
*police* employees erred in maintaining records in a warrant

database. "[I]solated," "nonrecurring" police negligence, we determined, lacks the culpability required to justify the harsh sanction of exclusion.

\* \* \*

Indeed, in 27 years of practice under *Leon*'s good-faith exception, we have "never applied" the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct. [Citations omitted.]

The *Davis* Court held that when the police conduct a search in objectively reasonable reliance on appellate precedent that is binding, the exclusionary rule is inapplicable. *Davis*, 564 US at ___; 131 S Ct at 2423-2424.

The principles and sentiments expressed in *Davis* and found in the quoted passage above were also expressed by our Supreme Court in *People v Frazier*, 478 Mich 231, 247-251; 733 NW2d 713 (2007). The *Frazier* Court stated that "application of the exclusionary rule is inappropriate in the absence of governmental misconduct." *Id.* at 250.

In this case, the only police conduct that is deterred by applying the exclusionary rule is conduct in which the police, having at least some indicia of need, enter a home in a good-faith effort to check on the welfare of a citizen after a concerned neighbor contacted police. This is not the type of police conduct that we should be attempting to deter. The lower court rulings excluding the evidence and dismissing the charge would not deter police misconduct in the future; it would only deprive citizens of helpful and beneficial police action. The benefits of suppression are clearly outweighed by the heavy cost suffered by the community. The record does not reflect any police misconduct, nor does it indicate that officer Emmi and his partner engaged in or exhib-

ited deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights. Findings of such behavior cannot even be inferred from the existing record. Had there been little to no basis to enter defendant's house, or had there been some indication that the officers were motivated by the hope of finding criminal activity afoot, then one might be able to infer or find misconduct or deliberate, reckless, or grossly negligent disregard for the Fourth Amendment. But such conduct did not occur in this case. Rather, the record establishes that the police officers acted with an objectively reasonable good-faith belief that their conduct was lawful. They did not burst into defendant's home absent an assessment of the situation or absent alternative efforts to communicate with the homeowner. Instead, they spoke with defendant's neighbor, assessed the situation based on her comments and their personal observations, and then tried to communicate with any person inside the house before deciding that entry was necessary. At worst, the officers' conduct involved simple, isolated, and nonrecurring negligence. There is no indication that the police used the neighbor's concerns as a ruse or subterfuge to search defendant's home in an effort to find evidence of criminal wrongdoing. The officers' conduct was innocent and lacked the culpability required to justify the harsh sanction of exclusion. Accordingly, even were we to assume that the community-caretaker exception did not apply and that a constitutional violation occurred, exclusion of the marijuana was not required and thus the charge should not have been dismissed.

Reversed and remanded to the district court for reinstatement of the marijuana manufacturing charge. We do not retain jurisdiction.

WHITBECK, J., concurred with MURPHY, C.J.

MARKEY, J. (*dissenting*). On March 8, 2010, at about 12:30 a.m., Hazel Park police officer Mike Emmi broke, entered, and searched defendant's home purportedly to perform a "welfare check." Emmi acted after a ten-minute investigation into the complaint by a person of unknown credibility, who admittedly had little to no interaction with defendant, and who lived several houses away. When the prosecutor asked if his "concern at that time that there was possibly someone in the house that was in need of assistance," Emmi replied, "[t]he only time--the only thing we go in for is a check on a--for a person." This indicates that Emmi entered the home not on the reasonable belief that someone inside needed his assistance but only to see if, in fact, someone were inside. This was a search without a warrant that was neither reasonable nor justified by any exception to the warrant requirement of the Fourth Amendment of the United States Constitution and article 1, § 11 of the Michigan Constitution. Both the district court, which heard Emmi's testimony, and the circuit court that reviewed the district court's decision concluded that the prosecutor failed to establish any exception to the warrant requirement and that the evidence seized during the unreasonable search and seizure must therefore be suppressed. I agree and therefore respectfully dissent. I would affirm the trial courts' decisions.

"A court's factual findings at a suppression hearing are reviewed for clear error, but the application of the underlying law—the Fourth Amendment of the United States Constitution and article 1, § 11 of the Michigan Constitution—is reviewed de novo." *People v Slaughter*, 489 Mich 302, 310; 803 NW2d 171 (2011).

The Fourth Amendment of the United States Constitution guarantees to the people that their houses shall remain free from unreasonable intrusion by the government, providing:

> The right of the people *to be secure in their* persons,
> *houses*, papers, and effects, *against unreasonable searches
> and seizures*, shall not be violated, and no Warrants shall
> issue, but upon probable cause, supported by Oath or
> affirmation, and particularly describing the place to be
> searched, and the persons or things to be seized. [Emphasis
> added.]

Likewise, Const 1963, art 1, § 11 guarantees the
security of people's houses:

> The person, *houses*, papers and possessions of every
> person *shall be secure from unreasonable searches and
> seizures*. No warrant to search any place or to seize any
> person or things shall issue without describing them, nor
> without probable cause, supported by oath or affirmation.
> The provisions of this section shall not be construed to bar
> from evidence in any criminal proceeding any narcotic
> drug, firearm, bomb, explosive or any other dangerous
> weapon, seized by a peace officer *outside the curtilage of
> any dwelling house* in this state. [Emphasis added.]

Thus, "[t]he Fourth Amendment of the United States
Constitution and its counterpart in the Michigan Con-
stitution guarantee the right of persons to be secure
against unreasonable searches and seizures." *People v
Kazmierczak*, 461 Mich 411, 417; 605 NW2d 667 (2000).
The plain language of both constitutional protections
demonstrates that their core value, second only to
protecting people, is protecting people's houses from
unreasonable governmental intrusion. "The United
States Supreme Court has repeatedly stated that the
'physical *entry* of the home is the chief evil against
which the wording of the Fourth Amendment is di-
rected . . . .' " *City of Troy v Ohlinger*, 438 Mich 477,
485; 475 NW2d 54 (1991), quoting *United States v
United States Dist Court for the Eastern Dist of Mich*,
407 US 297, 313; 92 S Ct 2125; 32 L Ed 2d 752 (1972).
"[T]he privacy of the home stands at the very core of the

Fourth Amendment and . . . in no setting is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." *Slaughter*, 489 Mich at 316 (quotation marks and brackets omitted), quoting *Payton v New York*, 445 US 573, 589-590; 100 S Ct 1371; 63 L Ed 2d 639 (1980).

On the other hand, the Fourth Amendment and Const 1963, art 1, § 11 do not forbid all government searches and seizures, only those that are unreasonable. *Slaughter*, 489 Mich at 311. The two main requirements rendering a police search or seizure constitutionally reasonable are the presence of probable cause and the possession of a warrant. *People v Davis*, 442 Mich 1, 10; 497 NW2d 910 (1993). "Searches conducted without a warrant are *per se* unreasonable under the Fourth Amendment, 'subject only to a few specifically established and well-delineated exceptions.' " *Id.* (citation omitted). Thus, to show that their conduct was lawful, the police in this case were required to show either that they had a warrant—they did not—"or that their conduct fell under one of the narrow, specific exceptions to the warrant requirement." *Id.*

State and federal courts have recognized several exceptions to the warrant requirement, including "searches of automobiles, searches incident to contemporaneous lawful arrests, inventory searches conducted according to established procedure, searches conducted during exigent circumstances, and searches the police undertake as part of their 'community caretaking' function." *Slaughter*, 489 Mich at 311-312. Providing emergency aid to injured persons is included within the community-caretaking function of the police. *Id.* at 314 n 28.

The emergency-aid exception allows the police to enter a protected area without a warrant "under cir-

cumstances where they believe some person is in need of assistance or to prevent serious harm to someone." *Davis*, 442 Mich at 12. Under the emergency aid exception,

> [the] police may enter a dwelling without a warrant when they reasonably believe that a person within is in need of immediate aid. They must possess specific and articulable facts that lead them to this conclusion. In addition, the entry must be limited to the justification therefor, and the officer may not do more than is reasonably necessary to determine whether a person is in need of assistance, and to provide that assistance. [*Id.* at 25-26.]

Cases in which the emergency-aid exception have been held to apply include: (1) *Ohlinger*, 438 Mich at 480-483—while investigating a citizen report of a possible accident in which a man drove away while apparently injured, the police went to the driver's house where they saw through a window a man bleeding and apparently unconscious inside; (2) *People v Brzezinski*, 243 Mich App 431, 432, 434-435; 622 NW2d 528 (2000)—a citizen reported seeing a man who had seemed to be disoriented and injured leaving the scene of a suspicious fire, and the police found a person who matched that description passed out in the back of a car parked nearby; (3) *People v Beuschlein*, 245 Mich App 744, 756; 630 NW2d 921 (2001)—the police, who responded to a 911 domestic-disturbance call that had possibly involved the use of weapons, heard scuffling inside while waiting for someone to come to the door; and (4) *People v Tierney*, 266 Mich App 687, 691, 704-705; 703 NW2d 204 (2005)—at the home of a murder suspect the police saw through a window in the door a man with a rifle and ammunition close at hand who was sitting slumped over with his head on the table as if he had shot himself; he had not responded or reacted when the officers knocked on the door.

Under the circumstances of this case, the warrant-less entry and search cannot be justified by the emergency-aid exception. Officer Emmi responded after midnight to speak to the complainant,[1] who lived a few houses down the street from defendant. She had called the police at some unknown point in time because she had not seen defendant or his vehicle move for a few days. The complainant did not testify at the hearing in district court, but Emmi testified the complainant knew defendant because they lived in the same neighborhood. Thus, Emmi had information that one neighbor had not seen defendant for a few days. Emmi did not speak with neighbors to defendant's immediate left or right or across the street regarding their knowledge of defendant's whereabouts. Emmi found there were lights on in the home, but no one responded to knocking, a telephone call, or shouts. The house was secure except for one unlocked window, and curtains or drapes blocked Emmi's view of the inside of the house. A couple days of mail was in the small box attached to the house, and a telephone book and some "junk mail" were on the porch. A car registered to defendant that had not been recently driven was in the driveway. There were no signs of forced entry or foul play or any other evidence to indicate that someone inside required assistance. Although the complainant had reported that defendant's cats would look out windows, Emmi testified the cats did not appear unfed or uncared for and "were just at the window." Emmi also testified that he could hear a humming noise from inside the house that he thought might be a humidifier or heater. Based on his ten-

---

[1] Emmi admitted to having had prior contacts with the complainant, as did narcotics officer Paul Holka, who when asked about the complainant, testified that, "Yes, I have heard that name."

minute investigation, Emmi testified that from "what we got from the neighbor, not seeing him in a while, lights on inside, cats trying to get out, we tried to do a welfare check and see if the person was inside." Emmi entered the house through the unlocked window. While searching the home, he found marijuana plants growing in a bedroom closet. Emmi indicated he searched the closet because it was big enough to accommodate a person. Officer Emmi had no specific and articulable facts to support a conclusion that (1) someone was in the home and (2) in need of immediate assistance.

At the conclusion of the testimony, the district court requested that the parties brief the search and seizure issues presented. Subsequently, the district court ruled that the prosecution had failed to present sufficient credible evidence to support a reasonable belief that someone was inside defendant's home *and* in need of emergency assistance. The court concluded that "it doesn't appear as though there's enough information to determine whether or not there was a person within [the house]." The district court questioned the credibility of the information the complainant provided, as well as the police investigation, stating:

> In this case, there was testimony from a neighbor.[2] And I'm not sure it was even established a proximity of that neighbor to the home in question.

> She said it was very unusual for his behavior. Well, what's the foundation for that statement? How long as [sic] he known the neighbor? Or how long as [sic] she known the neighbor? To what degree does she have any interaction with this person?

---

² The complainant did not testify in the district court proceedings; her information was only provided through the hearsay testimony of Emmi.

The neighbor said that she hadn't seen the person in days, usually he comes and goes daily. It had been a few days up to a week. There was no close relationship between this witness and the neighbor. And when the police officer arrived, he sought to contact the neighbor to the right. There was no one home. Neighbor to the left, there was no one home. No inquiry as to the neighbor across the street.

\* \* \*

So I don't think in this case we've established enough information. I mean, even if . . . we can argue that Officer Emmi corroborated it, I don't even think there's enough information to corroborate to determine whether or not someone was actually in that home. I mean, there's a plausible explanation. I left for Mackinaw [sic] Island, I asked my wife did you get someone to pick up our mail? No. So, we left on a Thursday, didn't get back on a [sic] Monday. We leave a light on, of course, to be sure that people think we're home. We lock our doors.

I just don't think the set of circumstances in this case meet the threshold requirements to enter the home without a warrant pursuant to the community caretaking function. And, therefore, the Court will dismiss the case.

On the prosecution's appeal, the circuit court summarized the facts and the district court's ruling that under *Davis*, 442 Mich at 25-26, the evidence did not support a reasonable belief that someone was inside defendant's home that needed immediate aid; rather, the evidence "simply supported that the homeowner may be out of town for a weekend trip." The circuit court concluded that the district court did not clearly err in its factual findings nor make an error of law in suppressing the evidence and dismissing the case.

I agree with the district court and the circuit court. The police possessed no credible, specific and articu-

lable facts that anyone was inside defendant's home that might need immediate aid. Defendant's neighbor indicated that she had not seen defendant for a few days, but she did not provide any information on the requisite requirements that he was at home and that he might be injured or in need of immediate assistance. The police conducted a patently cursory investigation: they did not question defendant's immediate neighbors to find out if they knew whether anyone was in the house; they made no effort to locate any of defendant's friends, relatives or co-workers; and they did not see or hear anything from within or without the house giving rise to a concern that required immediate action to protect life or property. As noted from the excerpts of Emmi's testimony, he simply did not know whether anyone was in the house, much less that there was someone there that needed immediate aid.

Indeed the facts of this case are no different from what officers everywhere would find day in and day out while people were away from their homes for any variety of reasons, reasons that provide no support of an objective reasonable belief that someone is in immediate need of the assistance contemplated by the caretaking exception. Indeed, the facts as presented here, if accepted as an appropriate invocation of the caretaking exception, are frighteningly amenable to flagrant violations of the Fourth Amendment. Under the pretense of concern for someone's well-being, officers could easily iterate mundane facts to support the warrantless entry of a citizen's home. I conclude therefore that the district court did not clearly err in its findings of fact, nor err in its conclusions of law that the warrantless search here was unreasonable under the Fourth Amendment and Const 1963, art 1, § 11. Consequently, the district court

properly applied the exclusionary rule,[3] and dismissed the case. The circuit court properly and correctly upheld its dismissal.

The prosecution also argues, and the majority agrees, that the entry and search in this case were justified under the community-caretaking exception as applied in *Slaughter*, 489 Mich 302. Again, I disagree. In *Slaughter* our Supreme Court held that the community-caretaking exception applied when a fireman, "responding to an emergency call involving a threat to life or property, reasonably enters a private residence in order to abate what is reasonably believed to be an imminent threat of fire inside." *Slaughter*, 489 Mich at 316-317. *Slaughter* is clearly distinguishable from the instant case because *Slaughter* involved a situation in which firemen were "responding to an emergency call involving a threat to life or property" and needed to enter the house to address "an imminent threat of fire inside." There was simply no emergency call in this case and no emergency. Rather, a neighbor of unknown credibility provided information that she had not seen defendant or his car moved for a few days. But there was no evidence to suggest that anyone was in defendant's house or that anyone in the house was in danger; there is no evidence to support a reasonable belief that an imminent threat to life or property justified an exception to the warrant and probable cause requirement of the Fourth Amendment and Const 1963, art 1, § 11.

Because the warrantless entry and search of defendant's house was not authorized under the emergency-

---

[3] In general, "evidence obtained in violation of the Fourth Amendment is inadmissible as substantive evidence in criminal proceedings." *In re Forfeiture of $176,598*, 443 Mich 261, 265; 505 NW2d 201 (1993). The "exclusionary rule" "is a cornerstone of American jurisprudence that affords individuals the most basic protection against arbitrary police conduct." *Id.*

aid or community-caretaking exceptions to the warrant requirement, the district court did not err by granting defendant's motion to suppress, and the circuit court did not err by affirming that decision.

Finally, I must strongly and respectfully disagree that this case presents a situation in which the application of the exclusionary rule may be excused because the police acted in good faith, and the application of the exclusionary rule would serve no deterrent purpose. I agree that the purpose of applying the exclusionary rule in this case would be to "deter future Fourth Amendment violations." *Davis v United States*, 564 US ___; 131 S Ct 2419, 2426; 180 L Ed 2d 285 (2011). Indeed, " 'the exclusionary rule is 'a harsh remedy designed to sanction and deter police misconduct where it has resulted in a violation of constitutional rights . . . .' '" *People v Frazier*, 478 Mich 231, 247; 733 NW2d 713 (2007) (citations and brackets omitted). But this case is unlike *Davis* where the police acted in objectively reasonable reliance on then binding judicial precedent.[4] *Davis*, 131 S Ct at 2428. Nor is the present case like *Frazier*. There the issue was the admissibility of the testimony of witnesses located as a result of the defendant's statement, which was later suppressed because a court determined that it was obtained as the result of ineffective assistance of counsel. *Frazier*, 478 Mich at 234-238. Thus, in *Frazier* there was "*no* police misconduct whatsoever," and the witnesses "identities were not obtained as a result of any police misconduct." *Id.* at 250-251.

---

[4] Specifically, the police acted in reliance on *New York v Belton*, 453 US 454; 101 S Ct 2860; 69 L Ed 2d 768 (1981), overruled in part *Arizona v Gant*, 556 US 332; 129 S Ct 1710; 173 L Ed 2d 485 (2009), as interpreted by the Eleventh Circuit Court of Appeals in *United States v Gonzalez*, 71 F3d 819, 825 (CA 11, 1996). "The search incident to Davis's arrest in this case followed the Eleventh Circuit's *Gonzalez* precedent to the letter." *Davis*, 131 S Ct at 2428.

The majority cannot cite a single appellate case that has upheld the warrantless midnight entry and search of a residence on the basis of the say-so of a neighbor, virtually a stranger to the home's occupant, who has simply not seen the occupant for a few days and wherein the police conduct a cursory ten-minute investigation disclosing no evidence—or even a hint—of imminent threat to life or property. In other words, no caselaw on similar facts exists which provides support of the proposition that the police could have been acting in good-faith reliance. Nor do I view the police conduct here as lacking culpability. A certified police officer in this state must be presumed to have a rudimentary understanding of the Fourth Amendment and its rules of thumb requiring probable cause and a warrant or consent before an entry may be made into a person's home. I conclude that the police conduct in this case was at a minimum sloppy to negligent. The police in this case violated the Fourth Amendment and Const 1963, art 1, § 11. Their conduct fully warrants applying the exclusionary rule to deter future police misconduct and to protect the constitutional rights guaranteed by the Fourth Amendment and Const 1963, art 1, § 11.

I would affirm.