*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v

DEREK LAMAR MURRAY,

    Defendant-Appellant.

UNPUBLISHED
February 18, 2026
9:46 AM

No. 371913
Wayne Circuit Court
LC No. 23-005300-01-FC

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v

DEREK LAMAR MURRAY,

    Defendant-Appellant.

No. 371914
Wayne Circuit Court
LC No. 23-005308-01-FC

Before: CAMERON, P.J., and M. J. KELLY and YOUNG, JJ.

PER CURIAM.

In Docket No. 371913 of these consolidated appeals,[1] defendant appeals by right his jury-trial convictions of assault with intent to commit murder (AWIM), MCL 750.83; assault with a dangerous weapon (felonious assault), MCL 750.82(1); and two counts of possession of a firearm during a felony (felony-firearm), MCL 750.227b(1). In Docket No. 371914, defendant appeals by right his separate jury-trial convictions of AWIM; one count of first-degree home invasion, MCL 750.110a(2)(a); three counts of felony-firearm; and one count of intentional discharge of a firearm at a dwelling, MCL 750.234b(1). Although defendant appeals from his convictions in both

---

[1] *People v Murray*, unpublished order of the Court of Appeals, entered August 14, 2024 (Docket Nos. 371913 and 371914).

cases, he only challenges his convictions in Docket No. 371914 on appeal. For the reasons set forth below, we remand for an evidentiary hearing to determine whether the good faith exception applies.

## I. FACTUAL AND PROCEDURAL BACKGROUND

These appeals arise out of defendant's consolidated jury-trial convictions for separate shootings that took place on September 24, 2023, and October 4, 2023. In March 2023, the relationship between defendant and his live-in girlfriend of 4 years, April Parker, became violent. According to Parker, she called the police on defendant so many times that she began to recognize responding officers. In August 2023, defendant was charged with two misdemeanor domestic violence charges involving Parker and, as a condition of release, he was placed on a tether with electronic monitoring. After his release from custody, defendant resided with his father, whose house was about a five-minute drive from the home defendant formerly shared with Parker, which he was prohibited from visiting.

In the late hours of September 24, 2023, defendant, who still had keys to Parker's home, entered the home without her knowledge and discovered her naked and asleep in bed with Theophilus Watson, a man from the same neighborhood and with whom defendant was familiar. Watson was awakened by a sudden blow to the head, and he saw defendant standing over him holding a handgun. Defendant then shot Watson once in his arm and again in his knee. Watson ran out of the house. As Watson was fleeing, defendant shot at him a third time, narrowly missing his head. Watson lost consciousness after seeking refuge at a neighbor's house, and woke up later that morning in the hospital. A few days later, Watson met with police and identified defendant as his shooter. Data from defendant's tether also showed that defendant was not at his father's home shortly before and after the shooting, and Parker's home fell within the tether's location data available during the time frame of the shooting.

On October 3, 2023, Parker failed to appear in court to testify in the domestic violence case. Therefore, the charges against defendant were dismissed. Defendant did not go to the police station that day to have his tether removed, so it remained attached to his ankle.

The next day, October 4, 2023, Parker was at her home drinking with her friend, Brian Hurst. Shortly after 1:00 a.m., Parker and Hurst were sitting on the couch when the living room window was suddenly shot out. Parker hit the floor, and defendant entered the house through the broken window, firing multiple shots. Parker then felt what she believed was a gun pressed against her head. Defendant asked her whether the house's cameras were on, which she denied. Defendant then left and Parker went to check on Hurst, who was bleeding in her living room. Parker retrieved a towel for Hurst, but by then defendant had returned and told her to tell the police that she was robbed. After defendant left, Parker returned to the living to find that Hurst was gone, having stumbled out the front door and around to the side of the house. Parker then called the police, and Hurst was admitted to the hospital to receive treatment for five gunshot wounds. Detroit Police detectives later contacted the Fugitive Apprehension Service Team, who used defendant's tether location to confirm his presence at Parker's home the night of the shooting. Detectives requested an arrest warrant for defendant and a search warrant for his home on Coyle Street based, in part, on that information.

Before trial, defendant moved to suppress his tether location data from the October 4, 2023 shooting on Fourth Amendment grounds. Defendant's motion was denied. He then moved the court for reconsideration, requesting an evidentiary hearing. This motion was also denied, and the tether data was introduced to the jury at trial. Defendant was convicted as noted above. This appeal followed.

## II. STANDARDS OF REVIEW

This Court reviews de novo a trial court's ruling on a motion to suppress. The trial court's factual findings are reviewed for clear error, and the underlying constitutional issues, including whether a Fourth Amendment violation occurred, are reviewed de novo. A factual finding is clearly erroneous if it leaves the Court with a definite and firm conviction that the trial court made a mistake. [*People v Moorman*, 331 Mich App 481, 484-485; 952 NW2d 597 (2020) (quotation marks and citations omitted).]

This Court also reviews preserved, nonstructural issues of constitutional error to determine whether the beneficiary of the error has established that it is harmless beyond a reasonable doubt. *People v Anderson (After Remand)*, 446 Mich 392, 405-406; 521 NW2d 538 (1994).

## III. FOURTH AMENDMENT SEARCHES

Defendant argues that the evidence of his tether location data should have been suppressed. He also contends that he is entitled to an evidentiary hearing to determine whether the good-faith exception applied. We agree, in part.

The United States and Michigan Constitutions guarantee the right to be free from unreasonable searches and seizures. U.S. Const., Am. IV; Const. 1963, art. 1, § 11.

A search within the meaning of the Fourth Amendment occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. The touchstone of the Fourth Amendment is reasonableness. When an individual has a reasonable expectation of privacy in the area searched, or the materials seized, a search has been conducted. An expectation of privacy is reasonable only if the individual exhibited an actual, subjective expectation of privacy and that actual expectation is one that society recognizes as reasonable. Whether the expectation exists, both subjectively and objectively, depends on the totality of the circumstances surrounding the intrusion. [*People v DeRousse*, 341 Mich App 447, 454-455; 991 NW2d 596 (2022) (quotation marks and citations omitted).]

A search under the Fourth Amendment includes circumstances when the State "attaches a device to a person's body, without consent, for the purpose of tracking that individual's movements." *Grady v North Carolina*, 575 US 306, 309; 135 S Ct 1368; 191 L Ed 2d 459 (2015). "[S]earches or seizures conducted without a warrant are presumptively unreasonable and, therefore, unconstitutional." *People v Barbarich*, 291 Mich App 468, 472; 807 NW2d 56 (2011).

Evidence obtained in violation of the Fourth Amendment is generally inadmissible at trial. *Moorman*, 331 Mich App at 485. This exclusionary rule "is a judicially created remedy that

originated as a means to protect the Fourth Amendment rights of citizens to be free from unreasonable searches and seizures." *People v Hawkins*, 468 Mich 488, 498; 668 NW2d 602 (2003). The purpose of the rule is to deter police misconduct. *People v Goldston*, 470 Mich 523, 526; 682 NW2d 479 (2004). But there are several exceptions to the exclusionary rule. *People v LoCicero (After Remand)*, 453 Mich 496, 508-509; 556 NW2d 498 (1996). The government bears the burden of showing that an exception to the warrant requirement applies. *People v Cartwright*, 454 Mich 550, 561; 563 NW2d 208 (1997). Moreover, even when an exception to the warrant requirement applies, the search itself must be reasonable. *Id*. at 558. Our courts measure reasonableness by examining the totality of the circumstances, which "is a fact-intensive inquiry that does not lend itself to resolution through the application of bright-line rules." *People v Williams*, 472 Mich 308, 314; 696 NW2d 636 (2005).

This case boils down to two questions. First, whether defendant's failure to immediately return his tether after his domestic violence case was dismissed reflects his implicit consent to the government's continued monitoring of his whereabouts. Second, if the consent exception is inapplicable, whether the good faith exception to the exclusionary rule applies.

A. CONSENT EXCEPTION

"Consent searches, when voluntary, are an exception to the warrant requirement." *People v Frederick*, 500 Mich 228, 242; 895 NW2d 541 (2017). "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *People v Farrow*, 461 Mich 202, 208; 600 NW2d 634 (1999) (quotation marks and citation omitted). Whether consent was voluntarily given "turns on whether a reasonable person would, under the totality of the circumstances, feel able to choose whether to consent." *Frederick*, 500 Mich at 242.

We are unpersuaded by the prosecutor's assertion that defendant's continued wearing of the tether constitutes consent. Defendant's signed tether agreement states that he was responsible for the care and return of the tether, and would be financially liable if the tether was lost or damaged. The agreement expressly authorizes "members of the Electronic Monitoring Unit of the Wayne County Sheriff's Department and other police officers, they may designate, to enter and search my/our residence and/or vehicle(s) during the *entire duration I am in the Electronic Monitoring Program*, regardless of day or time of search." (Emphasis added.) The agreement also provides that defendant must "allow the Electronic Monitoring Officers to enter the residence and make household checks as needed *for the duration of the program*," and notes that defendant "expressly waive[d his] 4th Amendment rights *during the time [he was] in the Electronic Monitoring Program*." (Emphasis added.) The terms of the agreement clearly contemplate that defendant's consent to warrantless searches of his person and property hinged on his continued participation in the Electronic Monitoring Program, not on his continued wearing of the tether. As the prosecution concedes, defendant "was not still subject to the conditions of his pretrial release" as of October 4, 2023. Thus, any consent initially given by defendant expired by the time officers accessed his tether location data regarding the October 4, 2023 shooting. Moreover, his continued wearing of the tether was "no more than acquiescence to a claim of lawful authority," *Farrow*, 461 Mich at 208, given that he was still responsible for maintaining and returning the equipment. Accordingly, the trial court erred by finding the consent exception to the exclusionary rule applied.

## B. GOOD FAITH EXCEPTION

Relying on federal precedent, our Supreme Court adopted the good-faith exception to the exclusionary rule in *Goldston*, 470 Mich at 541. Under the good-faith exception, evidence obtained through a defective search warrant is admissible when the executing officer relied upon the validity of the warrant in objective good faith. *Id*. at 525-526, 540-541. In adopting the good-faith exception, our Supreme Court noted that the primary purpose of the exclusionary rule is to deter "official misconduct by removing incentives to engage in unreasonable searches and seizures." *Id*. at 529. To that end, "application of the exclusionary rule is inappropriate in the absence of governmental misconduct." *People v Frazier*, 478 Mich 231, 250; 733 NW2d 713 (2007). Indeed, "application of the exclusionary rule in these circumstances further encroaches upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth." *Id*. at 250-251 (quotation marks and citations omitted).

The good-faith exception has been extended to a variety of circumstances involving warrantless searches. This includes searches conducted in reasonable reliance on statutes subsequently declared unconstitutional, *Illinois v Krull*, 480 US 340; 107 S Ct 1160; 94 L Ed 2d 364 (1987); searches conducted in reasonable reliance on erroneous information contained in a database maintained by judicial employees, *Arizona v Evans*, 514 US 1; 115 S Ct 1185; 131 L Ed 2d 34 (1995); searches conducted in reasonable reliance on the emergency-aid exception to the warrant requirement, *People v Lemons*, 299 Mich App 541, 550; 830 NW2d 794 (2013); and searches conducted in reasonable reliance on the community-caretaking exception to the warrant requirement, *People v Hill*, 299 Mich App 402, 414; 829 NW2d 908 (2013). Moreover, in *Hill*, 299 Mich App at 411, this Court held that:

> [E]ven if a constitutional violation by the officers had occurred on the basis of a lack of criteria sufficient to justify invocation of the community-caretaker exception, there is no need to invoke the exclusionary rule because the good-faith exception to the rule has gradually been extended by the courts to situations outside its traditional or historical contexts, and the police officers in this case were clearly acting in good faith.

Here, the trial court denied defendant's motion to suppress concluding that, under *Herring v United States*, 555 US 135; 129 S Ct 695; 172 L Ed 2d 496 (2009), the good-faith exception applied because there was "no evidence of deliberate, reckless, or grossly negligent conduct by the police." But this misconstrues *Herring*'s holding. Our Supreme Court recently clarified in *People v Lucynski*, 514 Mich 888, 890-891; 9 NW3d 327 (2024), that, under *Herring*:

> Suppression turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct. Therefore, excluding evidence that was obtained as a result of reasonable reliance on a mistake made by a third-party would not necessarily deter police misconduct because there is no culpable or wrongful police conduct to deter. In other words, where the police error was the result of isolated negligence attenuated from the arrest, the exclusionary rule should not apply. [Quotation marks and citations omitted.]

Therefore, *Herring* did not establish an all-purpose "recklessness or gross negligence" standard that must be met before unlawfully obtained evidence is subject to the exclusionary rule. *Herring* simply recognized that, when police reasonably and in good faith rely on a third party, there is no culpable or wrongful conduct to deter. Indeed, this focus on third-party authority is the through-line in cases where courts have applied the good-faith exception to warrantless searches. In each instance, law enforcement officers reasonably relied on some third-party authority to determine the permissiveness of the contested search, whether that authority is a magistrate judge, a database, or a then-existing body of law. *Goldston*, 470 Mich 523; *Krull*, 480 US 340; *Evans*, 514 US 1.

That said, the record here is unclear whether law enforcement officers in this case reasonably relied on the terms of defendant's tether agreement—authorizing warrantless searches of defendant's person and property—when conducting the challenged search. On one hand, the fact that Detroit Police Officers sought and obtained a warrant to search defendant's home on October 4, 2023 could suggest that they knew defendant's domestic violence charges had been dismissed; otherwise, they could have conducted a warrantless search under the tether agreement. But, by the same token, conducting a warrantless search of defendant's location data could suggest officers understood that defendant was still lawfully subject to pretrial monitoring. Further, although defendant's domestic violence case was dismissed on October 3, 2023, it is not clear from the record whether the order of dismissal was entered that day, what law enforcement officers learned about the dismissal, and when the officer who conducted this warrantless search obtained this knowledge.[2]

---

[2] Defendant provided this Court with transcriptions of audio from body-worn camera footage indicating that responding officers at the scene may have been aware that the domestic violence charges against defendant had been dismissed. But "[a]ppeals to the Court of Appeals are heard on the original record," MCR 7.210(A), and parties may not expand the record on appeal, *People v Nix*, 301 Mich App 195, 203; 836 NW2d 224 (2013). Aside from an identical citation in defendant's motion for reconsideration below, neither the transcriptions provided by defendant nor the actual recordings themselves appear in the lower court file. They are, therefore, not part of the original record, and may not be considered on appeal. These videos and transcripts, however, may be introduced by defendant at the evidentiary hearing on remand.

Because evidence of officers' actual knowledge is necessary to determine whether they were acting in good faith at the time of the contested search, further factual development on this issue is necessary. We, therefore, remand to the trial court for an evidentiary hearing to determine whether the good-faith exception applies. Additionally, we direct the parties on remand to submit evidence pertaining to when the order dismissing defendant's domestic violence charges was entered. If the trial court determines the evidence should have been excluded from trial, it should also consider whether defendant is entitled to a new trial as a result of the error. See *Anderson*, 446 Mich at 405-406. We retain jurisdiction.

/s/ Thomas C. Cameron
/s/ Michael J. Kelly
/s/ Adrienne N. Young

# Court of Appeals, State of Michigan

## ORDER

PEOPLE OF MI V DEREK LAMAR MURRAY

Docket No.    371913; 371914

LC No.        23-005300-01-FC; 23-005308-01-FC

Thomas C. Cameron
Presiding Judge

Michael J. Kelly

Adrienne N. Young
Judges

For the reasons stated in the opinion issued with this order, we REMAND this case for further proceedings. We retain jurisdiction. After the remand proceedings conclude, we will review the decisions that the trial court made during those proceedings and consider any remaining issues in this appeal. Any challenges to the trial court's decisions on remand must be raised in this appeal. Therefore, the parties and the trial court must not initiate a new appeal from an order entered on remand within the scope of this appeal. The Clerk of the Court is directed to reject the initiation of a new appeal from such an order.

Appellant must initiate the proceedings on remand within 21 days of the Clerk's certification of this order, and the trial court must prioritize this matter until the proceedings are concluded. The proceedings on remand are limited to the issues addressed in our opinion.

The parties must serve copies of their filings in the trial court on this Court. Appellant must file with this Court copies of all orders entered on remand within seven days of entry.

Appellant must ensure the transcript of all proceedings on remand is filed in the trial court and this Court within 21 days after completion of the proceedings.

_____
Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

February 18, 2026
Date

Chief Clerk