# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

DEMETRIUS TERRELL MAGGIT,

        Defendant-Appellee,

FOR PUBLICATION
May 30, 2017
9:00 a.m.

No. 335651
Kent Circuit Court
LC No. 16-004364-FH

Before: BECKERING, P.J., and MARKEY and SHAPIRO, JJ.

PER CURIAM.

In this interlocutory appeal, the prosecution appeals by leave granted the trial court's order granting defendant Demetrius Terrell Maggit's motion to suppress his statements and physical evidence obtained following his seizure and subsequent search by police. We affirm the trial court's ruling.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant is currently charged with possession of a controlled substance analogue (Clonazepam), MCL 333.7403(2)(b)(*ii*), resisting and obstructing, MCL 750.81d(1), and possession with intent to distribute an imitation controlled substance, MCL 333.7341(3). The charges arose out of an incident that began in a parking lot located at 101 Sheldon in Grand Rapids, Michigan. At approximately 10:00 a.m. on or about April 27, 2016, the Grand Rapids police officer involved was positioned behind a van in an adjacent parking lot across the street. The officer had worked in the neighborhood for the past four years and was watching the parking lot because it was known for drug sales and use. The parking lot primarily serves two establishments, the Cherry Street Dental Clinic and Dwelling Place. According to the officer, the owners of those establishments had concerns about the illegal activities that occurred in the parking lot and "the management from Dwelling Place has signed a letter of intent to prosecute trespassers" as a result of those concerns. The letter was kept on file with the Grand Rapids Police Department and was not generally known to the public.

The morning of the incident was sunny, and the parking lot had frequent traffic that day. In addition, the establishments that used the parking lot were open for business to the public. The police officer observed two men—one of whom was later identified to be defendant—walk to the parking lot from an adjacent sidewalk. The men did not walk toward the only door that led to Dwelling Place or the dental clinic. Instead, they walked toward the rear corner of the parking

-1-

lot where there was no door. Neither man attempted to move toward any of the cars in the parking lot. The officer opined that the path the men traversed would have taken them "a little more than a car length" from a no-trespassing sign located in the center of the parking lot. Based on his experience in that neighborhood and other drug transactions he had witnessed, the officer suspected "that there was an exchange" of narcotics between the two men. However, given his positioning across the street, the officer could only see that the two men were standing next to each other in the parking lot, and he could not see whether they engaged in any type of narcotics transaction.

Defendant and the other man left the parking lot and returned to the sidewalk. They then began walking south on the sidewalk toward Cherry Street. At that point, the officer notified dispatch that he was "going to be stopping two that were trespassing" and that he needed backup.[1] The officer approached the men from behind, identified himself as a police officer, and told them, "you have to stop." Brown complied with the command, but defendant continued to walk. Thereafter, defendant was told, "[T]his is the police, you have to stop. *You are under arrest for trespassing.*" (Emphasis added). The officer testified that he decided "to go hands-on" with defendant, and he told defendant to place his hands on the top of his head so that he could handcuff defendant. Defendant raised his hands to be handcuffed. As the officer reached for his handcuffs, defendant turned and ran back to the parking lot, where he ran down a set of stairs at the back of the lot that enter onto 106 South Division.

The officer briefly pursued defendant, but eventually gave way to two other officers who were coming to the area because of his request for backup. The record is not entirely clear, and the details come primarily from the parties' written submissions to the trial court, but it appears that the other officers eventually caught defendant and that some sort of struggle ensued. Also at some point—again, it is not entirely clear based on the evidence presented at the suppression hearing—defendant dropped or discarded a white container with 14 green pills inside of it. In addition, the other officers searched defendant and found bags containing an unknown substance or substances that tested negative for any controlled substances.

After the other officers arrested defendant, they took him back to the initial officer, who had detained Brown. At this point, the officers ran defendant's name through the Law Enforcement Information Network (LEIN), and they discovered that he had an outstanding arrest warrant for "Absconding parole." Until that time, the officers did not know who defendant was or that he had an outstanding warrant for his arrest. In a written opinion and order, the trial court found—and the prosecution has not contested this finding—that by the time the officers discovered the valid arrest warrant, they had already arrested and seized defendant. That is, the discovery of the warrant came *after* the search and seizure in this case.

---

[1] Although he did not note as much in his police report, the officer who initiated contact with defendant testified at the suppression hearing that he also believed he could stop defendant and Brown for what he suspected was a drug transaction in the parking lot. He testified that he had a "reasonable suspicion" of a narcotics sale at that point.

Defendant filed a motion to suppress the evidence. At issue in the motion was whether the police officer's seizure and attempted arrest[2] of defendant were lawful and whether the exclusionary rule should apply to the evidence seized in this case. The trial court granted the motion.

## II. WAS THERE AN UNREASONABLE SEARCH AND SEIZURE?

### A. STANDARD OF REVIEW

"This Court reviews a trial court's factual findings at a suppression hearing for clear error, and the court's ultimate ruling de novo." *People v Cohen*, 294 Mich App 70, 74; 816 NW2d 474 (2011).

### B. ANALYSIS

"US Const, Am IV, and Const 1963, art 1, § 11, guarantee the right of the people to be free from unreasonable searches and seizures." *People v Brown*, 279 Mich App 116, 130; 755 NW2d 664 (2008). At the heart of any issues concerning the constitutional guarantee is reasonableness. *People v Williams*, 472 Mich 308, 314; 696 NW2d 636 (2005). A search and seizure conducted without a warrant are unreasonable per se, subject to certain exceptions. *Brown*, 279 Mich App at 131. One well-recognized exception is that "[a] custodial arrest based on probable cause is not an unreasonable intrusion under the Fourth Amendment." *People v Nguyen*, 305 Mich App 740, 751; 854 NW2d 223 (2014). Moreover, if an arrest is lawful, i.e., based on probable cause, any search incident to that arrest is lawful as well. *Id*. at 756

"This probable cause standard 'is a practical, nontechnical conception' judged from the totality of the circumstances before the arresting officers." *Cohen*, 294 Mich App at 75, quoting *Maryland v Pringle*, 540 US 366, 370; 124 S Ct 795; 157 L Ed 2d 769 (2003). "Probable cause to arrest exists where the facts and circumstances within an officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *People v Champion*, 452 Mich 92, 115; 549 NW2d 849 (1996).[3] In determining whether probable cause existed, a reviewing court is to make an objective inquiry based on the facts and circumstances

---

[2] The prosecution made no effort to argue that a seizure did not occur at this time, nor did the prosecution argue that any such seizure ended when defendant fled from the first officer. Further, the prosecution made no argument based on the United States Supreme Court's decision in *California v Hodari D*, 499 US 621; 111 S Ct 1547; 113 L Ed 2d 690 (1991). Accordingly, we accept the prosecution's apparent concession of these matters and only decide the issues before us.

[3] In addition, MCL 764.15(1)(a) provides statutory authorization for a police officer to make an arrest without a warrant for a felony, misdemeanor, or ordinance violation committed in the officer's presence.

of the case, and a police officer's subjective characterization of the events is not controlling. *Nguyen*, 305 Mich App at 758.

The issue as the prosecution has presented it in this case is whether the police officer had probable cause to arrest defendant for violating a Grand Rapids city ordinance prohibiting trespassing when he first approached defendant.[4] The ordinance declares, in relevant part, that that no person shall "[t]respass upon the premises of another or unlawfully remain upon the premises of another to the annoyance or disturbance of the lawful occupants." Grand Rapids Ordinance, § 9.133(1). This Court interprets ordinances in the same manner it interprets statutes, *People of Grand Rapids v Gasper*, 314 Mich App 528, 536; 888 NW2d 116 (2016), meaning that it begins, and ends, with the plain language of the ordinance in order to ascertain the ordinance's meaning, see *People v Williams*, 288 Mich App 67, 83; 792 NW2d 384 (2010). The ordinance at issue contains two prohibitions: (1) a prohibition on "trespassing"; and (2) a prohibition against "unlawfully remain[ing]" on land "to the annoyance or disturbance of the lawful occupants." The prosecution does not raise an argument about the first prohibition, i.e., the undefined term of "trespass"; instead, the prosecution argues that the officer had probable cause to believe defendant violated the second part of the ordinance—remaining at 101 Sheldon to the annoyance or disturbance of the lawful occupants.

We agree with the trial court's conclusion that there was no probable cause to arrest defendant for trespassing at 101 Sheldon under the city ordinance against trespassing. The evidence produced at the suppression hearing reveals that defendant was on property that was open to the public, during business hours, for a very brief period of time. During that brief time, no indication was given that defendant was told to leave or that he annoyed or disturbed anyone. The officer testified that he did not have any prior contact with, or knowledge of, defendant, nor did he have knowledge that anyone at 101 Sheldon ever gave any indication that defendant was not welcome there. The plain language of the ordinance states that a violation occurs when one: (1) remains on the property; and (2) does so to the annoyance or disturbance of the lawful occupants. On the evidence presented at the suppression hearing, there is no indication that a lawful occupant of the property was annoyed or disturbed by defendant's presence. Indeed, there is no testimony that anyone—other than Brown—had any type of communication with defendant while he was on the property. And again, there is no evidence that defendant had previously been told not to enter the property. As such, the facts as they were known gave no indication that defendant annoyed or disturbed anyone, much less that he *remained* at 101 Sheldon after annoying or disturbing a lawful occupant.

---

[4] The issue before the trial court concerned whether probable cause existed for the officer who initiated contact to believe that defendant either violated the city ordinance or MCL 750.552, the criminal trespassing statute. Because the prosecution does not make an argument about the statute on appeal, we do not consider it in detail. However, for many of the reasons articulated below—mainly that defendant was on property that was open to the public and he was never told to leave before to his arrest—there was no probable cause to arrest for that offense, either.

-4-

The fact that the officer knew the parking lot at 101 Sheldon was often used for illegal drug transactions and other illicit purposes does not change the analysis.[5]  Although a drug transaction would likely annoy or disturb the lawful occupants of 101 Sheldon, there was no evidence that any lawful occupant on the property—the subject officer was *not* on the property at the time—was annoyed or disturbed by anything that occurred in this case.  Further, there was scant evidence for a reasonable officer to believe that defendant and Brown had engaged in such a transaction.  The two men merely stood in a corner of the parking lot for a short period of time.  In addition, even assuming that this could satisfy the requirement of "annoyance or disturbance," there is no evidence, and the prosecution has not articulated an argument in this regard, that the men "remained" upon the premises in violation of the ordinance.  According to the only evidence presented at the suppression hearing, the men were in the parking lot for a very brief time and they left immediately after standing together.  In fact, they had already left the parking lot before the officer had a chance to approach them.

In arguing that probable cause existed, the prosecution cites a "no-trespassing letter" signed by one of the occupants of 101 Sheldon as well as the no-trespassing sign in the parking lot.  Essentially, the prosecution contends that the no-trespassing letter informed the Grand Rapids Police Department that the lawful property owners at 101 Sheldon were annoyed and disturbed by illegal activity occurring in the parking lot and that the no-trespassing sign on the property communicated as much to all who entered the property, including defendant.  In other words, according to the prosecution, police had the unilateral authority to revoke defendant's permission to be on the property and to arrest defendant *without* telling defendant that he was not welcome on the property.  This argument is unconvincing.  Initially, as the trial court recognized in this case, the no-trespassing letter does not create or establish an element of the trespassing ordinance; it merely grants authorization to police officers to ask occupants of the parking lot to leave the parking lot.  In this regard, the letter contains an express authorization allowing "the GRPD to ask unauthorized persons to leave the property," and if such persons refuse, the letter authorizes "the GRPD to enforce any violations of the law on the property."  But here, the officer never asked defendant to leave the property, nor did he have any kind of contact with defendant before the attempted arrest.

Moreover, any reliance by the prosecution upon the no-trespassing sign is equally without merit.  The sign—which is printed in relatively small lettering—merely informed visitors to the parking lot that "no trespassing" would be tolerated and "violators will be prosecuted."  An admonition not to do that which is against the law—trespass—can hardly be read as giving notice to all who enter property that is open to the public that, if they "annoy" or "disturb" anyone, they are subject to immediate arrest without warning.  In short, to adopt the prosecution's contention would be to find that a letter of which the public is generally unaware and a small sign made all who entered property that was held open to the public subject to

---

[5] This Court appreciates that fact that the police are attempting to eradicate illegal activities in the community; however, the issue before us is whether there was probable cause to arrest defendant under the presenting circumstances.  All members of the community remain entitled to freedom from unreasonable searches and seizures.

immediate arrest without warning. The plain language of the ordinance does not support this view. [6]

In arguing that this Court should not find a violation of the Fourth Amendment, the prosecution directs this Court's attention to the United States Supreme Court's opinion *Heien v North Carolina*, __ US __; 135 S Ct 530; 190 L Ed 2d 475 (2014). The prosecution argues that even assuming there was no violation of the trespassing ordinance, any mistake in concluding that there was an ordinance violation was a reasonable mistake of law. Given this reasonable mistake, according to the prosecution, there can be no Fourth Amendment violation.

In *Heien*, the Supreme Court addressed the issue of whether a law enforcement officer's mistaken view of the law "can nonetheless give rise to the reasonable suspicion necessary to uphold [a] seizure under the Fourth Amendment." *Heien*, __ US at __; 135 S Ct at 534; 190 L Ed 2d at 480. The Court held that a *reasonable* mistake of law could make an investigatory stop lawful. *Id*. In that case, Sergeant Matt Darisse stopped a vehicle for having one working brake light. *Id*. That stop led to a search of the car and to the discovery of a bag of cocaine. *Id*. at ___; 135 S Ct at 534-535; 190 L Ed 2d at 480-481. One of the occupants, Nicholas Brady Heien, moved to suppress the cocaine, arguing that the stop and search violated the Fourth Amendment. *Id*. at ___; 135 S Ct at 535; 190 L Ed 2d at 481. The North Carolina Court of Appeals held that the initial stop of the vehicle was not valid because driving with only one working brake light was not a violation of state law, despite what Sergeant Darisse believed. *Id*. This was based on the conclusion that the relevant statute, NC Gen State Ann § 20-129(g) (2007), mandated that all vehicles must be equipped with "a stop lamp on the rear of the vehicle." *Heien*, __ US at __; 135 S Ct at 535; 190 L Ed 2d at 481. The North Carolina Supreme Court reversed, concluding that a different statutory provision, which required originally installed "rear lamps" to be functional, made Sergeant Darisse's mistaken belief about the necessity of having two working lamps a reasonable mistake. *Id*. (citation omitted). And, because the Fourth Amendment requires reasonableness, there was no Fourth Amendment violation, according to the North Carolina Supreme Court. *Id*.

The United States Supreme Court held that a mistake of law can "give rise to the reasonable suspicion necessary to uphold [a] seizure under the Fourth Amendment." *Id*. at ___;

___

[6] In a conclusory footnote, the prosecution contends that a reasonable law enforcement officer in the Grand Rapids police officer's position would have had probable cause to believe that defendant violated a different part of the ordinance, § 9.133(3), which prohibits, among other matters, a person "conceal[ing]" himself on the premises of another to commit a crime or any offense. This argument, which is given cursory enough treatment to be considered abandoned, see *People v Payne*, 285 Mich App 181, 195; 774 NW2d 714 (2009), is meritless. Although defendant stood in the rear corner of the parking lot, there is no evidence in the record to conclude that he concealed himself in any way. Indeed, the officer testified that he saw defendant, who was standing in a parking lot open to the public on a sunny morning, the entire time. In fact, the only thing that obstructed the officer's view of defendant was the officer's own positioning behind a van.

135 S Ct at 534; 190 L Ed 2d at 480. In so concluding, the Court began by acknowledging that "the ultimate touchstone of the Fourth Amendment is reasonableness." *Id*. at ___; 135 S Ct at 536; 190 L Ed 2d at 482 (citation and quotation marks omitted). "To be reasonable is not to be perfect," explained the Court, "and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Id*. (citation and quotation marks omitted). Historically, the Court had held that the "reasonableness" standard permitted mistakes of fact, so long as the mistakes were "those of reasonable men." *Id*. (citation and quotation marks omitted).

"But reasonable men make mistakes of law, too," explained the Court,

and such mistakes are no less compatible with the concept of reasonable suspicion. Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground. Whether the facts turn out to be not what was thought, or the law turns out to be not what was thought, the result is the same: the facts are outside the scope of the law. There is no reason, under the text of the Fourth Amendment or our precedents, why this same result should be acceptable when reached by way of a reasonable mistake of fact, but not when reached by way of a similarly reasonable mistake of law. [*Id*. at ___; 135 S Ct at 536; 190 L Ed 2d at 482-483.]

Turning to the case before it, the Court in *Heien*, ___ US ___; 135 S Ct at 539; 190 L Ed 2d at 485, explained that the alleged mistake of law "relates to the antecedent question of whether it was reasonable for an officer to suspect that the defendant's conduct was illegal. If so, there was no violation of the Fourth Amendment in the first place." And in that case, the Court had "little difficulty concluding that the officer's error of law was reasonable." *Id*. at ___; 135 S Ct at 540; 190 L Ed 2d at 486. While referring to pertinent provisions of North Carolina law, which to that point had not previously been construed by the state's appellate courts, the Court explained why Sergeant Darisse's mistaken view of the law was reasonable:

Although the North Carolina statute at issue refers to "*a* stop lamp," suggesting the need for only a single working brake light, it also provides that "[t]he stop lamp may be incorporated into a unit with one or more *other* rear lamps." NC Gen Stat Ann. § 20–129(g) (emphasis added). The use of "other" suggests to the everyday reader of English that a "stop lamp" is a type of "rear lamp." And another subsection of the same provision requires that vehicles "have all originally equipped rear lamps or the equivalent in good working order," § 20–129(d), arguably indicating that if a vehicle has multiple "stop lamp[s]," all must be functional.

The North Carolina Court of Appeals concluded that the "rear lamps" discussed in subsection (d) do not include brake lights, but, given the "other," it would at least have been reasonable to think they did. Both the majority and the dissent in the North Carolina Supreme Court so concluded, and we agree. This "stop lamp" provision, moreover, had never been previously construed by North Carolina's appellate courts. It was thus objectively reasonable for an officer in

-7-

Sergeant Darisse's position to think that Heien's faulty right brake light was a violation of North Carolina law. And because the mistake of law was reasonable, there was reasonable suspicion justifying the stop. [*Heien*, __ US at __; 135 S Ct at 540; 190 L Ed 2d at 486-487 (some citations omitted).]

In the instant case—ignoring for purposes of this decision whether the rule from *Heien* is limited to ambiguous statutes—see *Sinclair v Lauderdale Co*, 652 Fed Appx 429, 435 (CA 6, 2016); *United States v Stanbridge*, 813 F3d 1032, 1037 (CA 7, 2016) ("The statute isn't ambiguous, and *Heien* does not support the proposition that a police officer acts in an objectively reasonable manner by misinterpreting an *unambiguous* statute."); but see *Cahaly v Larosa*, 796 F3d 399, 408 (CA 4, 2015)—we decline to find that *Heien* changes the outcome, because any mistake of law in this case was *unreasonable*. As an initial matter, the ordinance at issue in this case was not ambiguous[7] in regard to the conduct it prohibited. The ordinance prohibited remaining on property to the annoyance or disturbance of the lawful owner. As noted, at some level, this required knowledge on the part of defendant that he was annoying or disturbing someone on the property; otherwise it could not fairly be said that he "remained" on the property to the annoyance or disturbance of the lawful occupants. And here, defendant was only on the property for a brief period of time and did relatively little while he was on the property. Given the elements of the ordinance, the conclusion that defendant violated the ordinance was not objectively reasonable.

Comparing the instant case to the situation in *Heien* is useful. In essence, the officer in *Heien* stopped the defendant for only having one working brake light when a fair reading of a statute gave the officer the express authority to do so. In addition, no state appellate court had interpreted the statute at issue. Here, by contrast, the ordinance was clear, and it plainly did not permit an arrest in a situation such as the one that occurred in this case. On this record, we decline to find a reasonable mistake of law.

Next, in addition to arguing that the police officer had probable cause to arrest, the prosecution argues that, based on his observations and experiences regarding drug transactions, the officer had a reasonable suspicion that defendant and Brown had engaged in a drug transaction, thereby justifying a stop or seizure of the men.

If a police officer has a reasonable, articulable suspicion that criminal activity is afoot, the officer may briefly detain a suspect for the purpose of performing an investigatory stop. See *People v Barbarich*, 291 Mich App 468, 473; 807 NW2d 56 (2011), citing *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). A detention for the purpose of investigating criminal behavior does not violate the Fourth Amendment. *Barbarich*, 291 Mich App at 473. However, "[t]he scope of any search or seizure must be limited to that which is necessary to quickly confirm or dispel the officer's suspicion." *Id*. Police officers are permitted to take action in order to ensure their safety during *Terry* stops, see *People v Nimeth*, 236 Mich App 616, 624;

---

[7] Regardless whether the finding of statutory ambiguity is necessary for an application of *Heien*, the clarity—or lack thereof—of the ordinance is relevant in considering whether a mistaken interpretation of the ordinance was reasonable.

601 NW2d 393 (1999), and in some instances this can include the use of handcuffs, see *Brown v Lewis*, 779 F3d 401, 415 (CA 6, 2015).

We agree with the trial court that the prosecution's argument with regard to reasonable suspicion and a *Terry* stop are without merit in this case. The trial court found that the officer attempted to effectuate an arrest of defendant and that he did not attempt to merely conduct an investigatory stop. This was a factual finding—which is reviewed for clear error, see *Cohen*, 294 Mich App at 74—based on the officer's testimony that he intended to arrest defendant and Brown and that he told defendant "you have to stop. *You are under arrest*." (Emphasis added). As is apparent from the suppression hearing and the body camera video, the officer went to handcuff defendant immediately. On this record, the trial court's factual finding was not clearly erroneous. Moreover, because there is no basis to conclude that the officer conducted an investigatory stop or attempted to make an investigatory stop, whether he had reasonable suspicion that would have justified an investigatory stop and a brief detention are irrelevant in this case.[8]

## III. SHOULD THE EXCLUSIONARY RULE APPLY?

Having agreed with the trial court's decision that an unlawful seizure[9] occurred in this case, we next consider whether the exclusionary rule should bar the use of the unlawfully seized evidence at defendant's trial. The prosecution contends that the discovery of the valid warrant for defendant's arrest attenuated the connection between the unlawful stop and the evidence seized from defendant.

"[E]vidence discovered in a search incident to an unlawful arrest may be subject to the exclusionary rule as the 'fruit of the poisonous tree.' " *People v Reese*, 281 Mich App 290, 295; 761 NW2d 405 (2008) (citation omitted). The exclusionary rule is a judicially created doctrine intended to compel compliance with the right of persons to be free from unreasonable searches and seizures. *People v Hill*, 299 Mich App 402, 412; 829 NW2d 908 (2013), citing *Davis v*

---

[8] Had this incident entailed a *Terry* stop, at issue would be whether a police officer has reasonable suspicion to stop two men for having briefly spoken to one another in a parking lot and then leaving. If two people talking in an area known for drug transactions can serve as the basis for a *Terry* stop, then anyone having a conversation in certain neighborhoods can be frisked at any time. This suggests that there is an exception to the fourth amendment for all people living in or passing through certain neighborhoods. In the absence of seeing a hand-off or other conduct supporting a concern that an illegal transaction was taking place, we would not deem the facts here sufficient to justify a *Terry* stop.

[9] Again, based on the arguments presented, we only concern ourselves with the seizure as articulated by the prosecution: that is, the seizure that occurred when the officer who initiated contact attempted to arrest defendant. Also, given that the prosecution makes no effort to argue that the evidence in this case was discovered apart from that initial seizure, we accept for purposes of our decision that the evidence, which was later discarded during defendant's flight, was discovered as a result of the officer's initial seizure.

*United States*, 564 US 229, 236; 131 S Ct 2419; 180 L Ed 2d 285 (2011). The rule "is a harsh remedy designed to sanction and deter police misconduct where it has resulted in a violation of constitutional rights and should be used only as a last resort." *People v Corr*, 287 Mich App 499, 508; 788 NW2d 860 (2010) (quotation marks and citation omitted). The purpose of the exclusionary rule is to deter police misconduct and to prevent future Fourth Amendment violations. *Hill*, 299 Mich App at 412, citing *Davis*, 563 US at 236-237. "Where suppression fails to yield appreciable deterrence, exclusion is clearly unwarranted." *Davis*, 564 US at 237 (citation and quotation marks omitted).

Application of the exclusionary rule is not predicated on a simple but-for test of whether the evidence " 'would not have come to light but for the illegal actions of the police.' " *Reese*, 281 Mich App at 295, quoting *Wong Sun v United States*, 371 US 471, 488; 83 S Ct 407; 9 L Ed 2d 441 (1963). "Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 US at 488 (quotation marks and citation omitted).

One such means by which the "primary taint" of illegal conduct may be purged is the attenuation doctrine. *Utah v Strieff*, __ US __, __; 136 S Ct 2056, 2059; 195 L Ed 2d 400, 405 (2016). In *Strieff*, the Court explained that "[i]n some cases . . . the link between the unconstitutional conduct and the discovery of the evidence is too attenuated to justify suppression." *Id.*, at ___; 136 S Ct at 2059; 195 L Ed 2d at 405. In that case, a police officer, Douglas Fackrell, observed defendant, Edward Strieff, exit a home where drug activity was suspected and walk toward a nearby convenience store, where Officer Fackrell then detained him. *Id.* at ___; 136 S Ct at 2060; 195 L Ed 2d at 406. Officer Fackrell relayed Strieff's information to a dispatcher, who informed Officer Fackrell that Strieff had an outstanding arrest warrant. *Id.* at ___; 136 S Ct at 2060; 195 L Ed 2d at 406. Officer Fackrell arrested Strieff and discovered narcotics and drug paraphernalia during a search incident to arrest. *Id.* The Supreme Court accepted the contention that Officer Fackrell's initial detention of Strieff was unlawful.[10] The issue in that case became "whether the discovery of a valid arrest warrant was a sufficient intervening event to break the causal chain between the unlawful stop and the discovery of drug-related evidence on Strieff's person." *Id.* at ___; 136 S Ct at 2061; 195 L Ed 2d at 408. In evaluating this issue, the Court evaluated three factors:

> First, we look to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Second, we consider "the presence of intervening circumstances." Third, and "particularly" significant, we examine "the purpose and flagrancy of the official misconduct." [*Id.* at ___; 136 S Ct at 2062; 195 L Ed 2d at 408 (citations omitted).]

---

[10] "At the suppression hearing, the prosecutor conceded that Officer Fackrell lacked reasonable suspicion for the stop." *Id.*, at ___; 136 S Ct at 2060; 195 L Ed2d at 406. See also *Id.* at ___; 136 S Ct at 2061-2062; 195 L Ed 2d at 407.

The Court found that the first factor—temporal proximity between the unlawful stop and the search—favored suppression. *Id*. The Court remarked, " '[o]ur precedents have declined to find that this factor favors attenuation unless 'substantial time' elapses between an unlawful act and when the evidence is obtained.' " *Id*., quoting *Kaupp v Texas*, 538 US 626, 633; 123 S Ct 1843; 155 L Ed 2d 814 (2003). And in *Strieff*, __ US at __; 136 S Ct at 2062; 195 L Ed 2d at 408, Officer Fackrell discovered the evidence "only minutes after the illegal stop."

The Court found that the second factor—the presence of intervening circumstances—"strongly favors the State." *Id*. The existence of a valid arrest warrant in that case, reasoned the Court, favored finding that "the connection between unlawful conduct and the discovery of evidence [was] sufficiently attenuated to dissipate the taint." *Id*. at ___; 136 S Ct at 2062; 195 L Ed 2d at 409 (quotation marks and citation omitted). The warrant was valid, it predated the investigation that led to Strieff's arrest, "and it was entirely unconnected with the stop." *Id*. Moreover, the arrest warrant *compelled* Officer Fackrell to arrest Strieff, "[a]nd once Officer Fackrell was authorized to arrest Strieff, it was undisputedly lawful to search Strieff as an incident of his arrest to protect Officer Fackrell's safety." *Id*. at ___; 136 S Ct at 2063; 195 L Ed 2d at 409.

As to the purpose and flagrancy of police misconduct, the Court found that this factor also "strongly favors the State." *Id*. The Court explained that the factor reflects the rationale that exclusion exists to deter police misconduct "by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Id*. And in that case, reasoned the Court, Officer Fackrell was at most negligent in concluding that he had sufficient cause to initiate a stop/detention of Strieff. *Id*. In addition, the Court explained that Officer Fackrell should have asked if Strieff would be willing to speak with him, rather than demanding that Strieff speak with him, thereby effectuating a seizure. *Id*. The Court explained that although Officer Fackrell made a few errors in judgment, "these errors in judgment hardly rise to a purposeful or flagrant violation of Strieff's Fourth Amendment rights." *Id*. Moreover, the Court concluded that "there is no indication that this unlawful stop was part of any systemic or recurrent police misconduct. To the contrary, all the evidence suggests that the stop was an isolated instance of negligence that occurred in connection with a bona fide investigation of a suspected drug house." *Id*.

Applying all of the factors, the Court held that application of the exclusionary rule was not warranted in that case. *Id*.

A decision from this Court, *Reese*, 281 Mich App at 290, is instructive as well on the issue of the attenuation doctrine. In that case, police officers approached Richard Reese outside of an apartment complex that was known for narcotics trafficking. After a verbal exchange with Reese, the officers informed him that the area was known for drug trafficking and that if he did not leave—or visit a friend whom he claimed he was visiting in the complex—he might be guilty of loitering. *Id*. at 292. The officers arrested Reese for loitering and, upon running Reese's information in the LEIN network, the officers learned of the existence of an outstanding misdemeanor warrant. *Id*. at 293. One of the officers informed Reese that he was being placed under arrest pursuant to the warrant—as well as for loitering—and the officers called a tow truck to have an inventory search performed on Reese's car. *Id*. The search revealed cocaine that later became the subject of a motion to suppress. *Id*. According to Reese, the officers lacked

probable cause to arrest for loitering, and any evidence discovered thereafter had to be suppressed as the fruit of an illegal search. *Id*. at 293-294. The circuit court agreed and suppressed the cocaine. *Id*. at 294.

On appeal to this Court, the prosecution argued that, even assuming the loitering arrest was unlawful, the misdemeanor arrest was lawful, and the officers could lawfully conduct a search of Reese's car incident to that arrest. *Id*. The issue before this Court was "whether the discovery of this preexisting warrant constitutes an independent basis, which dissipates the taint from the initial illegal arrest, for conducting the search of Reese's car[?]" *Id*. at 297. Similar to the manner in which the United States Supreme Court evaluated the issue in *Strieff* some eight years later, this Court utilized the same three-factor test and weighed: (1) the time between the illegal conduct and the discovery of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of police misconduct. *Id*. at 299, 303-304. In addition, the Court focused primarily on the following two points:

> (1) what evidence did the police obtain from the initial illegal stop *before* they discovered the outstanding arrest warrant, and (2) whether that initial illegal stop was a manifestation of flagrant police misconduct—i.e., conduct that was obviously illegal, or that was particularly egregious, or that was done for the purpose of abridging the defendant's rights. [*Id*. at 304 (quotation marks and citation omitted).]

In that case, this Court concluded that there was no evidence of police misconduct or an improper purpose by the officers. *Id*. at 304 ("Indeed, the officers not only made it clear to Reese that he was free to go, they actually asked him to leave at least twice."). Hence, there was no misconduct at issue. Moreover, this Court found significant the fact that the officers only discovered the drugs *after* they discovered the valid arrest warrant. *Id*. at 304-305. In sum, this Court held:

> Because the officers' initial misconduct—the arrest for loitering—was not particularly egregious or motivated by bad faith and only yielded Reese's identity, the subsequent discovery of the preexisting arrest warrant was not tainted by the illegality of that initial arrest. As such, the discovery of the preexisting warrant constituted an intervening circumstance that broke the causal connection between the illegal arrest and the discovery of the cocaine evidence. Because the search was independently justified as a search incident to the lawful arrest on the warrant, Reese was not entitled to have the cocaine evidence suppressed. [*Id*. at 305.]

In reaching this conclusion, this Court, in a footnote that should be considered dicta, offered its opinion on a hypothetical scenario that is relevant to this case. This Court considered the outcome of a scenario in which the police would have conducted the search following the illegal arrest and then later discovered the valid warrant only after discovering the narcotics. *Id*. at 305 n 4. In such a scenario, opined the Court, the "taint" of the illegal arrest would not have been purged by the after-the-fact discovery of a valid warrant:

> Had the officers searched Reese's car under authority of the illegal arrest and only later discovered the preexisting warrant, the discovery of the preexisting arrest warrant could not have served to dissipate or attenuate the illegality of the arrest and, accordingly, the cocaine evidence would clearly have been the "fruit" of the illegal arrest. [*Id*.]

Turning to the instant case, it should be noted from the outset that this case involves facts that differ significantly from those present in *Strieff* and *Reese* in regard to when the warrant and the evidence were discovered. While *Strieff* and *Reese* involved fact patterns of: (1) invalid seizure; (2) discovery of a valid arrest warrant; and (3) search and discovery of contraband; the instant case, as it has been argued by the prosecutor, involves a different fact pattern: (1) invalid seizure; (2) search and discovery of contraband; and (3) discovery of a valid arrest warrant.

Given the differences between this case and *Strieff* and *Reese*, we hold that the attenuation doctrine does not operate to bar the exclusion of the evidence. Looking to the factors enunciated in *Strieff* and *Reese*, we note the first factor in this case favors suppression because by all accounts the time between the illegal detention and the discovery of the evidence was relatively short. See *Strieff*, __ US at __; 136 S Ct at 2062; 195 L Ed 2d at 408. The second factor is where this case begins to take a significantly different path from *Strieff* and *Reese*. From the evidence presented in this case, the discovery of the valid warrant for defendant's arrest was not an intervening act that "broke" the causal chain between the initial, unlawful detention and the discovery of the evidence. Indeed, according to the officer's testimony at the suppression hearing, the warrant had no effect on the actions taken by police in this case, nor did it have any effect on the evidence that was recovered from defendant. In short, the instant case does not involve the discovery of a warrant as an intervening act that "purged" the taint from the illegal seizure; rather, it involves an after-the-fact discovery of a valid warrant and an attempt to apply that warrant as a post-hoc panacea for unlawful actions that were wholly unrelated to that warrant. Stated differently, the evidence "came to light through exploitation of the illegal conduct" rather than "by means sufficiently distinguishable to be purged of the taint from the illegal conduct." *Reese*, 281 Mich App at 299, citing *United States v Ceccolini*, 435 US 268, 276; 98 S Ct 1054; 55 L Ed 2d 268 (1978). Because of the factual differences between this case and *Strieff* and *Reese*, this second factor strongly favors suppression.

The final factor considers the purpose and flagrancy of police misconduct, with heed being paid to the idea that the exclusionary rule is intended to deter police misconduct. *Strieff*, __ US at __; 136 S Ct at 2063; 195 L Ed 2d at 409. In *Strieff*, the United States Supreme Court emphasized that deterrence was not warranted in that case because the officer's actions were "at most negligent" and there was "no indication that this unlawful stop was part of any systemic or recurrent police misconduct." *Id*. at ___; 136 S Ct at 2063; 195 L Ed 2d at 409-410. In the instant case, however, the case for suppression—and deterrence—is stronger. Although there is no suggestion from the record that the police officer acted with ill intent, and every indication that the Grand Rapids police are attempting to remedy a real problem, the case nevertheless involves an arrest—or attempted arrest—for simply walking into and out of a busy parking lot that was open to the public. As noted above, the idea that this conduct satisfied the elements of trespassing as it is defined under the pertinent ordinance was not reasonable. Moreover, the officer's justification for the arrest—the no-trespassing letter—brings up another important consideration. According to the officer's testimony at the suppression hearing, the Grand Rapids

Police Department has a practice of handing out such letters and arresting suspects in reliance, at least in part, on the letters.[11] This pattern of behavior suggests that the seizure in this case could have been part of the "systemic or recurrent police misconduct" about which the Court in *Strieff* was concerned. Thus, the instant case presents a case for deterrence.

In sum, in evaluating the three factors present in this case, we conclude the attenuation doctrine should not apply and we affirm the trial court's decision to suppress the evidence seized in this case.

## IV. CONCLUSION

There was no probable cause to arrest defendant for trespassing under the city ordinance and any mistake in concluding that there was probable cause was unreasonable. Therefore, the only seizure we have been asked to evaluate in this case was unreasonable. Moreover, given the factors announced in *Reese* and *Strieff*, we find application of the exclusionary rule is appropriate in this case.

Affirmed.

/s/ Jane M. Beckering
/s/ Jane E. Markey
/s/ Douglas B. Shapiro

---

[11] In its opinion and order, the trial court took note of and found to be persuasive an unpublished decision from this Court, *People v Clay*, unpublished opinion per curiam of the Court of Appeals, issued April 11, 1997 (Docket No. 183101). In *Clay*, the same police department at issue in this case arrested the defendant for trespassing when he walked through the parking lot of an Amoco gas station, as the officers perceived that he was "cutting across" the lot. *Clay*, unpub op at 1. The arresting officer was aware of a letter that the owner of the gas station had on file with the police department giving the police permission to arrest trespassers on the lot. *Id*. at 2. This Court held that there was not probable cause to arrest defendant for trespassing under the trespassing statute, MCL 750.552, because the statute "applies when an individual has been forbidden to enter or was notified to depart and neglects or refuses to do so." *Id*. at 3. The Court noted that the defendant "was not told to depart from the premises, and inasmuch as the lot was open to the public, the 'No Trespassing' signs were inadequate to inform defendant that he was forbidden to enter the parking lot." *Id*. This Court suppressed the evidence obtained as a result of the improper arrest. *Id* at 3.

The American Civil Liberties Union of Michigan and Linc Up submitted an amicus brief in this case and attached two Kent County cases—one from the circuit court 2010 and one from the district court in 2012—that entailed similar police conduct in reliance on merchant letters, resulting in successful motions for suppression. These cases, while not binding, serve to further support our conclusion that suppression is warranted for deterrence purposes.